## C. H. HODGE v. T. B. JONES.

Decided December 1, 1897.

**1. Contested Election—Ordering New Election.**

. Though under our statute (Revised Statutes, article 1804f) courts upon the trial of a contested election are directed to adjudge the election void and order another only where voters were denied the privilege of voting by officers or managers of election, this does not deprive the courts of the common law right, upon such contest, to declare such election void, where the freedom of ballot has been so materially interfered with by acts of violence or intimidation that the true choice of the voters can not be ascertained with certainty.

**2. Same.**

The contestant of an election showed that the returns, etc., of a precinct, at which he received a majority sufficient to have changed the result of the election, had been seized and destroyed by an armed mob and not counted by the commissioners court. It was shown that at another precinct some 700 voters had been driven away from the polls by intimidation sufficient to justify their alarm, and the proof was such as to leave doubt as to what would have been the result of a fair and free election. *Held,* that the court was justified in refusing to declare contestant elected, and in setting aside the election and ordering another.

APPEAL from Robertson. Tried below before Hon. W. G. TALIA-FERRO.

*W. O. Campbell* and *W. I. Purdom,* for appellant.—1. All the returns of the election from all the voting precincts, except Sutton box No. 11, were before the court, and the number of votes polled at Sutton box, for both contestant and contestee, was proven, so that nothing except a very simple calculation was required of the court to ascertain and determine the result of the election.

2. The only disturbance at the polls at said election occurred at Hearne box in the morning between 9 and 10 o'clock, which was caused by the firing of pistols or the explosion of firecrackers, whether accidentally or with design does not appear, and which continued not longer than thirty seconds of time, and which was not calculated to prevent men of ordinary firmness from voting, and which in fact did not prevent any legal voter from voting who desired to vote. The election was not arrested or broken up and no legal voters were excluded from the polls by violence or other means, and there was no such display of force as ought to have intimidated men of ordinary firmness. Rev. Stats. 1895, art. 1804f; McCrary on Elec., 3 ed., secs. 515, 526, 531; 6 Am. and Eng. Encyc. of Law, 358, 363, and notes; on the question of the weight as evidence of allegations in pleadings, see The Law of Evidence, by B. W. Jones, secs. 274, 295, 296.

3. Under the statute of this State the election can not be declared void by reason of intimidation of voters unless it appears from the evidence that such a number of legal voters were by the officers or managers of the election denied the privilege of voting as, had they been allowed to vote, would have materially changed the result. Rev. Stats. 1895, arts. 1730 to 1736, 1804f; 6 Am. and Eng. Encyc. of Law, 277, 359-363, 432,

433, and notes; McCrary on Elec., 3 ed., secs. 71, 135, 530, 531, 483, 428.

4. The court erred in not rendering judgment for the contestant, because the evidence showed conclusively that contestant received 2844 votes, and that contestee received 2783 votes at said election for said office of sheriff of Robertson County, giving to contestant a majority of 61 votes, and entitling him to the said office. Rev. Stats. 1895, arts. 1755, 1803, 1804e; 6 Am. and Eng. Encyc. of Law, 423, sub-title 5; Warren v. McDonald, 32 Law. Rep. Ann., 987; McCrary on Elec., 3 ed., sec. 444; Jones on Law of Ev., secs. 16, 17; on weight to be given to the testimony of W. R. Gentry and T. T. Breedlove, see McCrary on Elections, sec. 428.

*Field & Taylor* and *J. L. Goodman,* for appellee.—If it clearly appears from the evidence that the fairness and freedom of the election were interfered with by acts of violence, intimidation, or the presence of an armed force at the polls, to such an extent as, had such not been the case, the result might have been different or uncertain, the election should be set aside. Const., art. 16, sec. 2; Hocker v. Pendleton, 39 S. W. Rep., 250; McCrary on Elec., 3 ed., secs. 515-517, et seq.; 6 Am. and Eng. Encyc. of Law, 358-362, and cases cited.

KEY, ASSOCIATE JUSTICE.—At the last general election in this State appellant and appellee were opposing and the only candidates for sheriff of Robertson County. Returns were regularly made from all the voting precincts of the county except Sutton precinct, No. 11. As required by statute, the Commissioners Court canvassed the returns, and it appeared therefrom that appellee received 2745 votes, and appellant 2707 votes. Whereupon the county judge issued to appellee a certificate of election and he qualified as sheriff of the county. Thereafter, appellant instituted this proceeding to contest said election. He admitted that the returns before the Commissioners Court showed that appellee had received a majority of 38 votes, but alleged that at Sutton box, precinct No. 11, an election was held in the manner prescribed by statute, at which box he received 127 votes, and appellee received 32 votes; that after the returns from said box were made out and signed by the officers holding the election, said returns, together with the poll lists, tally lists, and ballots were destroyed by an armed force of men, who in the night time entered the house of the presiding officer of said election, and compelled him to deliver the same to them; and that said returns, poll lists, tally lists, and ballots were not considered by the Commissioners Court in canvassing the election returns.

Appellant also alleged that there was a mistake in the returns from the Hammond box, and as shown by the tally sheets, he was entitled to 10 more votes at that box than were counted for him by the Commissioners Court. Other grounds of contest were set up by appellant, but as there was no testimony bearing upon them, it is unnecessary that they be stated.

Appellee in his answer admitted that appellant was entitled to the 10 votes claimed by him at the Hammond box—also admitted that the returns, ballots, etc., from the Sutton box were seized by a mob and destroyed. He also alleged that, for certain stated reasons, the election held in the Sutton precinct was irregular, illegal, and void, and denied that the returns prepared by the managers of said election showed that appellant received 127 votes and appellee only 32 votes. He also charged that there were a number of illegal votes cast at said box. Appellee also alleged that, if appellant should be allowed all the votes he claimed at the Sutton and Hammond boxes, he would not be entitled to the office, because at Hearne voting box, in precinct No. 2, the fairness and freedom of the election were interfered with by acts of violence and intimidation. "That on the day of the election, and after the polls were opened and before they were closed at said box, in the forenoon of the election day, when a very large number of the legal qualified voters of said precinct were in the town of Hearne and near the polls and for the purpose of casting their ballots as rapidly as they could approach the polls, a number of armed men, with a view of preventing said electors casting their ballots, suddenly and without any provocation, with guns and pistols and other deadly weapons, assaulted such voters at the polls and in the streets of Hearne, when great fear came upon the electors, and through fear of their lives, and to escape threatened and real danger, more than 700 legally qualified electors fled in great terror and confusion from the polls through the town of Hearne and to their several homes for safety, and did not return to the polls and did not cast their ballots at said election." He also alleged that a large majority of the voters thus intimidated and prevented from voting intended and would have voted for him.

In his supplemental petition, appellant made the following admission concerning the alleged violence and intimidation at the Hearne box: "And further replying to the said amended answer, contestant says that it is true that a mob of armed men was guilty of the acts of violence and intimidation against the voters and did commit the outrages against the public peace, good order, and good government complained of by contestee, at the polling place at Hearne, voting box No. 2, on the day and at the time and in the manner alleged by contestee."

The case was tried by the court without a jury, and judgment rendered, declaring the election for sheriff null and void and directing the county judge to order another election in the manner required by law to fill said office.

The contestant has appealed, and claims that the court erred in declaring the election null and void, and in not rendering judgment establishing the fact that he was legally elected sheriff of Robertson County.

There was testimony tending to show that the election was held at the Sutton box, that the returns were prepared and signed by the election officers in the manner required by law, and that appellant received 127

and appellee between 30 and 40 votes at said box. Therefore, if the intimidation which occurred at Hearne could be ignored, it may be, as contended by appellant, that he is entitled to judgment ousting appellee and awarding the office to him.

Article 1804f of the Revised Statutes reads as follows: "Should it appear on the trial of any contest provided for in article 1801 that it is impossible to ascertain the true result of the election as to the office about which the contest is made, either from the returns of the election or from any evidence within reach, or from the returns considered in connection with other evidence, or should it appear from the evidence that such a number of legal voters were by the officers or managers of the election denied the privilege of voting, as, had they been allowed to vote, would have materially changed the result, the court should adjudge such election void and direct the proper officers to order another election to fill said office, which election shall be ordered and held and returns thereof made in all respects as required by the general election laws of the State."

It is contended on behalf of appellant that the first part of this statute does not apply, because from the testimony in the case it is easy to ascertain the result of the election; and it is also contended that the second part of the statute has no application, because the voters at the Hearne box were not denied the privilege of voting by the officers or managers of the election. The testimony fails to show that any of the officers or managers of the election were connected with or in anywise responsible for the riotous conduct at Hearne, and it may be that the case does not fall within the strict meaning of the statute; but without regard to the statute, we are of the opinion that the action of the court in declaring the election null and void is sustained by the common law on the subject. That law is announced by a text writer in the following language: "If it clearly appears that the fairness, purity, or freedom of an election has been materially interfered with by acts of violence, intimidation, or armed interference, such election should be set aside. Slight disturbances frequently occur, and are often sufficient to alarm a few of the more timid, without materially affecting the result or the freedom of the election. The true rule is this: The violence or intimidation should be shown to have been sufficient either to change the result, or that, by reason of it, the true result can not be ascertained with certainty from the returns. To vacate an election on this ground, if the election were not in fact arrested, it must clearly appear that there was such a display of force as ought to have intimidated men of ordinary firmness." McCrary on Elec., sec. 515.

In section 517, the same author says: "If it be made to appear that there was an armed force at the polls, and that a number of voters sufficiently numerous to affect the result or render it doubtful considered the presence of such force so menacing to them as to render it unsafe for them to vote, and that they had reasonable cause so to think, and if for this reason they declined to go to the polls, the election ought to be set aside." See also 6 Am. and Eng. Encyc. of Law, 358 to 362, and cases cited.

It was admitted by appellant in his pleadings and proved by the testimony of witnesses, that, on the morning of the election, a considerable number of gun or pistol shots were fired in the vicinity of the polls where the election was being held in the town of Hearne, by persons whose identity is not disclosed by the testimony in this record; that such conduct caused quite a sensation and prevented more than 700 electors from voting. It is asserted in appellant's brief that this disturbance was not calculated to prevent men of ordinary firmness from voting, and did not in fact prevent any legal elector, who desired to do so, from casting his ballot. The testimony shows that the persons who were intimidated and prevented from voting were colored people; and there is testimony in the record, aside from appellant's admissions, amply sufficient to warrant a finding that the disturbance was calculated to produce in the minds of such voters of ordinary firmness apprehension of danger to themselves should they attempt to vote. Appellee put about twenty of the intimidated voters upon the stand, and they all testified that they refrained from voting on account of the disturbance referred to, and that if they had voted, they would have voted for appellee.

J. F. Lane, a witness for appellee, testified as follows: "I am a practicing attorney and live in Hearne. On the day of the last general election, I was standing near the polls about 9 or 10 o'clock in the morning. All at once, the shooting and hallooing began and everyone ran. I ran, too; the crowd was pretty badly frightened. It (the shooting) started up and continued for a few seconds, fifteen or twenty shots being fired, and the streets were nearly cleared. After a while they began to gather around the polls, when there was more shooting and the streets were cleared again. The people ran over each other and everyone seemed to be thoroughly frightened. A good many of the people left the town and some went to the suburbs and stayed there. They never came up on the streets at all. There were some negroes who left their horses and ran off without them. I saw others jump on their horses and leave town. There were a good many people prevented from voting through fear. I think there was such an appearance of danger that it kept them from voting."

The testimony of A. G. Taylor and John E. Bishop shows that many colored voters were frightened, left town, and did not vote. Taylor stated that a good many negroes were afraid to go up to the polls to vote; that there were 600 or 700 who wanted to vote that did not.

Bishop testified that about 600 left town and did not vote. He said he was about 250 yards from the polls when the shooting began; he said: "There was shooting all around in that part of town, and everyone, both white and colored, ran; that it frightened the people and a great many left town and never came back at all; the Presbyterian preacher left town and never came back; that the negroes were nearly all scared to death. Excitement was pretty intense. The people thought there would be bloodshed. The excitement was of such a nature as to frighten an ordinary man."

Appellant stated in his supplemental petition that more than 700 qualified voters at the Hearne precinct did not vote, on account of said

acts of violence and intimidation. It is true that some of the witnesses did not regard the disturbance as of serious consequence, and the testimony shows that some persons present were laughing just after the shooting occurred, and appeared to regard it in the light of a joke; but the testimony above referred to and the admissions in appellant's pleadings justify the conclusion that it was intended to and did intimidate the voters. Appellant alleged that the voters so intimidated and prevented from voting would have cast their ballots for him. On this question, however, there was a diversity of opinion among the witnesses. Witnesses for appellant were of the opinion that a majority of the colored voters in the Hearne precinct were supporting and intending to vote for appellant. He failed, however, to produce a single voter to swear that he was prevented by the disturbance from voting for him. Quite a number of witnesses, the most of them colored men, who stated that they were prevented by the disturbance referred to from voting for appellee, gave it as their opinion that a majority of the colored voters in the Hearne precinct were supporting and intended to vote for appellee.

It is true that appellee was running on the Democratic ticket and appellant was the candidate on a fusion Republican and Populist ticket, and some of the witnesses stated that nearly all of the colored people in the Hearne precinct were Republicans; still, some of the witnesses, who stated that they themselves were colored Republicans, affirmed positively, that it was their intention, had they not been prevented by the violence referred to, to vote for appellee, and that such were the intentions of a great many others who were similarly situated. Appellant's witness, T. C. Reagan, gave it as his opinion that appellee had more influence with the colored voters than any other man in the county.

If the Sutton returns had reached the Commissioners Court, and the mistake of 10 votes from the Hammond box had been corrected, appellant's majority would have been only 67 votes. There is testimony in the record, much of it given by colored witnesses, tending to show that a majority of the voters who were intimidated and prevented from voting would have voted for appellee; and as the court filed no conclusions of fact and law, we presume that it was unable to determine which candidate would have received a majority of the entire vote of the county had there been no disturbance and intimidation at the Hearne box. There is ample testimony in the record to support this conclusion, and we would not be justified in overruling the trial court on that question.

If the intimidated voters had cast their ballots and appellee had received a majority of 68 of their votes, he would have been elected by a majority of 1 vote, reckoning the Sutton and Hammond boxes in accordance with appellant's contention. Therefore, what would have been the result had there been a fair election at Hearne is a matter of doubt, and in such case the courts have the power and it is their duty to declare the election void. It is true that appellant testified that a majority of the witnesses who swore that they were prevented by the intimidation from voting for appellee, had, previous to the election, promised to vote

for him. This, however, only intensifies the uncertainty as to what would have been the result had there been a fair election. When a voter promises to vote for one candidate, is prevented from voting, and then swears that he intended to vote for the other candidate, the most that can be said is that his vote is uncertain, and nothing but an actual test, wherein he will be compelled to vote for one man, will decide the matter.

Appellant charged appellee with complicity in the misconduct complained of at the Hearne and Sutton boxes; but the testimony does not sustain the charge. Therefore, we decide the case upon the theory that he is not responsible for the violence and misconduct at either place. And before closing this opinion, we desire to express, in unmistakable terms, our disapproval of the unlawful conduct referred to. Such interference with the right of the people to elect their officers assails the foundation of free government, and can not be sanctioned by the courts.

We limit our decision to the questions presented in the briefs and hold that the trial court committed no error in declaring the election void, and in refusing to render judgment for appellant for the office.

*Judgment affirmed.*

Justice COLLARD did not participate in the decision of this case.